**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Criminal Action No. 10-cr-00327-MSK

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

v.

1. MARTIN JAVIER ALAMOS-DELGADO,
2. MARTIN JAVIER ALAMOS-GARCIA,
3. JAVIER BATISTA-CERVANTES,
4. **HECTOR ARMONDO CHAVEZ,**
5. MAURO HERNANDEZ-RENTERIA,
6. DIONISIO SALGADO, and
7. CALVIN WAYNE SKIDMORE,

      **Defendants**.

**ORDER ON ADMISSIBILITY OF GOVERNMENT'S EXPERT TESTIMONY**

This Matter is before the Court on a Joint Motion for determination of the admissibility of Expert Testimony pursuant to Fed. R. Evid. 702 (**#179**). The Motion identifies the opinions of Drug Enforcement Agency (DEA) Special Agent Lori Butler, proffered by the Government, as well as Mr. Chavez's objections to those opinions. An evidentiary hearing was conducted on November 12. Having considered the evidence presented, the argument of counsel and the parties' post-hearing briefing (**#195, #196**), the Court finds and concludes as follows.

**I. Background[1]**

Agent Butler has been employed by the DEA for over thirty years. During such time, she investigated the activities of several drug trafficking organizations, and conducted surveillance

---

[1] Previously before the Court was Mr. Chavez's Motion to Sever (**#118**). Because Mr. Batista-Cervantes filed a Notice of Disposition (**#201**), Motion **#118** is denied as moot.

1

by intercepting wire communications among drug traffickers.  She is experienced in methods of transporting drugs commonly used by such criminal enterprises and the means by which members typically communicate.

In March of 2010, while investigating a drug trafficking organization believed to be importing drugs from Mexico into and through the United States to Canada, Agent Butler prepared an affidavit in support of a wiretap identified as target telephone five ("TT5"). The district court authorized the wiretap, and Agent Butler, together with other law enforcement officers, intercepted TT5 communications between suspected organization members. The communications were in Spanish.  Because Agent Butler does not speak Spanish, she was assisted by interpreters who interpreted/ translated[2] the Spanish communications into English.

Mr. Chavez was heard over the intercepted communications, and was charged in a multi-defendant, twelve-count Indictment **(# 1)** of participating in a conspiracy that obtained cocaine in Mexico, transported it into Colorado, and on into Canada where Mr. Chavez received it for distribution to Canadian buyers. Three counts are brought against Mr. Chavez: (i) Count 1, conspiracy to import cocaine into the United States and to export it, in violation of 21 U.S.C. § 963 and § 60(b)(1)(B)(ii); and (ii) Counts 10 and 12, each charging use of a communication facility in furtherance of a felony in violation of 21 U.S.C. § 843(b).

---

[2] The Court notes that there is a linguistic difference between interpretation (and interpreter) and translation (and translator).  Interpretation pertains to oral communications and translation refers to written communications.  The skills required to perform each function vary.  *See, e.g.,* http://blog.oxforddictionaries.com/2015/04/difference-interpreting-translation/. The evidence presented does not establish with certainty what method was used, what skills were required, or who performed the interpretation or translation in each instance. Agent Butler testified that, she relied on "at least four or five interpreters," most of who were contracted (rather than employed) by the Government, and who "summarized" and "transcribed" the intercepted communications into English. By way of example, during her testimony she examined transcripts of intercepted communications indicating that they were prepared by an "L. Flores."

The Government intends to call Agent Butler to testify about the techniques and code language commonly used by those engaged in illegal drug smuggling pursuant to FRE 702. Ordinarily, the FRE 702 Motion required by the Court would detail Agent Butler's particular testimony and the FRE 702 foundation objections asserted by Mr. Chavez. But, the Government did not disclose such specific testimony and Mr. Chavez made only general objections. As a consequence, at the hearing, the Court required the Government to identify with precision the testimony it expected to elicit at trial. According to the Government's oral statement, Agent Butler may be asked to testify that:

- It is common for those in the drug trade to use coded language to avoid detection.
- The words "work" or "labor" refer to controlled substances.
- The word "papers" commonly refers to either money (typically, cash) or to arrest or documents generated by law enforcement after they have seized a load of drugs. Documentation proving the seizure of drugs are important to those transporting the drugs because they prove that the drugs were indeed confiscated by authorities and not simply stolen and sold by those affecting the transport.
- The phrase "to iron [drugs]" or "ironing" refers to "cutting" a quantity of drugs with a filler material to producing a greater volume (albeit a diluted version) of a product.
- The phrase "good one" commonly refers to a kilogram of cocaine. Agent Butler derived this meaning from the context of intercepted telephone calls. For example, Agent Butler explained that she learned that the phrase "a good one" was used by Mr. Chavez and his co-conspirators to refer specifically to a kilogram of relatively pure cocaine that could then be cut with fillers based on the context of conversations heard over TT5.
- The term "jump" commonly refers to an individual crossing the border with drugs.

3

- In this case, the term "choke" (or "getting choked") was used to refer to being caught by the police. Agent Butler acknowledged that this term is not commonly used by drug traffickers, but she identified its meaning based on context coupled with her general knowledge that drug traffickers become concerned when a driver does not reach a delivery point at an appointed time.

- Based on communications in this case and Agent Butler's general experience, the phrase "not going to pick that shit up" refers to a decision by the designated recipients of a drug shipment to wait to retrieve it out of concern that the driver may be working with the police or that the vehicle may be under surveillance.

- Drug traffickers often use numerals without other context to identify either "pieces of controlled substances" (apparently meaning packages) or to refer to kilograms of cocaine. In this case, Agent Butler concluded that such numbers were references to drug quantities by comparing instances when co-defendants spoke about specific quantities of drugs to instances in which co-defendants described the same transactions using only numerals.

- References to "Uncle," "Old Man," and "Churro" in recorded conversations referred to particular co-defendants.

- It is a common practice for drug trafficking organizations to use concealed compartments in vehicles to hide drugs, that drug shipments may either be paid for prior to transportation or taken "on consignment" with payment rendered after delivery, and that bulk loads of cash are the preferred payment method.

**II. Analysis**

Agent Butler's proffered testimony falls into two categories: (1) practices and "code language" universally used by drug traffickers premised upon on Agent Butler's prior law

4

enforcement experience; and (2) Agent Butler's perception of the meanings of particular words and phrases used in communications involving TT5.

Mr. Chavez raised three objections in the Motion for the *Daubert* hearing **( #179),** but asserted only two at the hearing: (1) Agent Butler's testimony is not helpful to the trier of fact; and (2) her opinions on the meanings of code language particular to this case are not reliable because the words and phrases originated in Spanish, were translated into English for Agent Butler by unidentified third-party interpreters, and Agent Butler is unable to appreciate the nuances of the Spanish meanings.

It is helpful to first focus on the applicable law.  Adopted in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), FRE 702 identifies states specific foundational requirements for the admission of expert testimony.

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if (a) the expert's scientific technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of expert testimony bears the burden to demonstrate that the proffered testimony satisfies the foundational requirements of FRE 702 by a preponderance of the evidence. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999); *Ralston v. Smith & Nephew Richards, Inc.,* 275 F.3d 965, 970 n.4 (10th Cir. 2001); *see Daubert,* 509 U.S. at 592 n.10; Fed. R. Evid. 702, Advisory Committee note.

There is some confusion in the circuit jurisprudence about what must be considered by courts performing FRE 702's gatekeeper role.  Some Tenth Circuit decisions focus on determination of two issues – whether the expert testimony is reliable and whether it is relevant

(helpful to the trier of fact). *See, e.g., Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1120 (10th Cir. 2004); *United States v. Gabaldon*, 389 F.3d 1090, 1098 (10th Cir. 2004).  Applying those standards, lower courts sometimes engage in a free-form assessment rather than applying the specific requirements of FRE 702.  But this Court understands the two-part (helpful and reliable) reference to be only a general, short-hand description of the four specific foundational requirements found in FRE 702. Other decisions remind this Court that its focus should not be upon the merits of the conclusions reached by the witness, their general reliability or the reliability of the witness, but instead upon the witnesses' qualifications, the information he or she relied upon, and the methodology employed in deriving the witnesses' conclusions.  *See Daubert,* 509 U.S. at 595; *see also Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

Whether expert testimony is reliable depends on the method by which the witness reached his or her opinions.  Expert opinions must be derived by a person who has the requisite skill, knowledge, training, experience or expertise to both determine a proper methodology and to apply that methodology.  *See Daubert*, 509 U.S. at 592; *Bitler*, 391 F.3d at 1120. The methodology itself must also be reliable. *Daubert*, 509 U.S. at 592-93; Fed.R.Evid. 702(c).  In some instances, expert testimony is premised upon an analytical process which can be described, duplicated, and has a known error rate, and *Daubert* and its progeny catalog many inquiries that are helpful is assessing such an analytical process. Sometimes however, as noted in the Comments following Rule 702, expert testimony is based solely on experience. *See, e.g., Kumho Tire*, 526 U.S. at 138; *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002). In such event, the witness must explain how his or her experience leads to the conclusions reached and why that experience allows the expert to testify reliably based on the facts of the case. *United States v. Medina-Copete*, 757 F.3d. 1092, 1103-04 (10th Cir. 2014).  In addition,

the expert witness must have reliably applied his or her experience to derive at reliable opinions as to the facts presented. *See id.*

Relevance is simply a question of whether expert testimony will help the trier of fact understand or determine an essential issue. *See Bitler*, 400 F.3d at 1121; *see also Hoffman v. Ford Moto Co.*, 493 Fed. App'x 962, 972 (10th Cir. Aug. 16, 2012); *F.T.C. v. Accusearch, Inc.*, No. 06-cv-105-D, 2007 WL 4616274, *3 (D. Wyo. Feb. 5, 2007). The expert must provide testimony that goes beyond common sense observations a juror would be capable of drawing on his or her own. *See Am. Family Mut. Ins. Co. v. Techtronic Indus. N. Am., Inc.*, No. 1202609-KHV, 2014 WL 2196416, *3 (D. Kan. May 27, 2014).

### A. Common Practices and Code Language Used by Drug Traffickers

There is no challenge to Agent Butler's qualifications, her experience or the application of her experience as to these opinions. And because her testimony about commonly used practices, words and phrases, is based upon her extensive experience in past investigations rather than facts particular to this case, there is concerns regarding translation or interpretation. Thus, there is no meaningful challenge as to reliability in the formation of these opinions.

Mr. Chavez's objection is instead that Agent Butler's testimony will not aid the trier of fact. The Court disagrees. Many courts permit a law enforcement agent with experience investigating certain types of crimes or criminal organizations to testify regarding the methods used by such criminals, even though such testimony does not derive from formal "scientific" methods. *See, e.g., United States v. Kamahele*, 748 F.3d 984, 998 (10th Cir. 2014); *United States v. Garcia*, 635 F.3d 472, 477 (10th Cir. 2011); *United States v. Roach*, 582 F.3d 1192, 1206 (10th Cir. 2009); *United States v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991). Particularly, an agent or officer with past experience of code or slang words typical to a criminal enterprise

can testify as to the nonliteral meaning of code words or phrases heard over wiretaps. *United States v. Quintana*, 70 F.3d 1167, 1171 (10th Cir. 1995). Thus, by way of example, Agent Butler may testify that, in the context of drug trafficking, particular words have specialized nonliteral meanings, when explaining such meanings is material to the facts of this case.

The Court therefore finds that sufficient foundation has been shown under FRE 702 for the proffered testimony of Agent Butler about common practices and terminology used by drug dealers based on her past experience. Mr. Chavez's objections are overruled.

### B. Meaning of Language Intercepted Over TT5 Based on Current Investigation

The Government also intends to elicit testimony from Agent Butler as to the meaning of particular words and phrases heard over TT5. This presents different issues. Agent Butler's testimony in this regard is not premised upon her past investigatory experience, but instead upon the course and information obtained during the course of her investigation. In addition, this testimony is directly dependent on interpretation or translation by unidentified persons of Spanish words into English. Mr. Chavez objects that this testimony is both unreliable and will not aid the fact-finders.

The Court has some question as to whether all of the proffered testimony (namely, the testimony as to the particular meanings of code words Agent Butler learned through her investigation of this case) even falls under FRE 702. Intrinsically, expert testimony that is the product of past experience and training differs from percipient witness testimony unique to the facts or investigation of a particular case, and ideally, the expert testimony should be separated from the percipient testimony. But, in a context of an investigative officer who has substantial experience, the same witness may testify in both capacities. *See, e.g., United States v. Cheek*, 740 F.3d 440, 447 (7th Cir. 2014); *United States v. York*, 572 F.3d 415, 420-423 (7th Cir. 2009). The

*York* decision is particularly instructive. In *York*, an FBI agent testified with regard to two different subject areas - the meanings of certain drug-affiliated terms, such as "nine" (meaning nine ounces of cocaine), and "cook" (meaning the process used to make powder cocaine into crack cocaine) and the meaning of words was derived from his first-hand investigation of the particular crimes at issue. The Court had no difficulty in finding that FBI agent's testimony about "narcotics code words" derived from the agent's experience was expert testimony, while on the other hand, the agent's testimony about conclusions the Government reached as its investigation progressed was lay testimony from a fact witness. The Court explains, at some length, the importance of counsel carefully delineating those questions that call for the witness to testify based on expertise and those questions that call upon the witness to describe the steps and deductions he or she made as a lay witness while conducting the particular investigation. It also is important to properly instruct the jury as to the factors to be considered in assessing believability of the testimony in each context.

Like the FBI agent in *York*, Agent Butler is testifying as to what happened in this investigation – what she saw, did, and inferred from the information presented to her and particularly, from communications heard over TT5. For example, her belief that references to "Uncle," "Old Man," and "Churro" were to particular co-defendants is not a product of methodology or training. It is, instead, an inference or deduction that she drew from information in the investigation. Such percipient testimony is not subject to FRE 702 foundational requirements and can be tested at trial.

However, arguably, some opinions by Agent Butler about the meaning of words used in communications over TT5 arguably would be subject to FRE 702. As to this testimony, Mr. Chavez objects on reliability grounds.

9

Mr. Chavez argues that, here, Agent Butler's "methodology" depended on the interpretation or translation of the Spanish oral communications into English. He argues that because Agent Butler does not speak Spanish, she cannot assess the nonliteral meaning of the words used in the wire communications because she cannot "calibrate for the complexity and nuance inherent to language translations." *See United States v. Charles*, 722 F.3d 1319, 1324 (11th Cir. 2013) (differences in dialect and colloquial language may frustrate any nonliteral interpretations); *see also Inverpan v. Birtten*, 646 F.Supp.2d 1354, 1359 (S.D. Fla. 2009).

Mr. Chavez directs the Court to *United States v. Gonzalez*, 365 F.3d 656 (8th Cir. 2004) *vacated by Gonzalez v. United States*, 125 S.Ct. 1114 (2005), which demonstrates the importance of correct interpretation/translation and explores a means for resolution of differing meanings in interpretation/translation.  In *Gonzalez*, at issue were English transcripts of intercepted Spanish wire communications. The oral communications included certain Spanish words ("tontas," "mosca") the literal meaning ("dummies," "fly") of which were seemingly inconsistent with the context in which they were spoken ("He has five dummies, he is letting me have them for two," "what I want is to go and give them some fly").  The English transcripts substituted "tons" of drugs, "money" for the literal Spanish words.  The defendant objected to the transcripts and sought to submit his own transcripts containing the more literal translations, which the trail court allowed. On appeal, the Eighth Circuit criticized the Government's practice of having its translator convert the literal Spanish words into what it believed was an English translation of a coded meaning.  The Circuit explained that in circumstances involving coded language in drug transactions, the preferable practice would be a stipulation to a correct literal translation.  If no agreement could be achieved, then each party could present a literal translation.

Mr. Chavez has a point. The correctness of the coded meaning determined by Agent Butler depends on the accuracy of the literal translation/interpretation. It is not necessary that Agent Butler engage in both the literal translation/ interpretation, however, so long as she works from an accurate, literal interpretation/ translation that was prepared by someone who can "calibrate for the complexity and nuance inherent to language translations." Put another way, Agent Butler's opinion decodes the meaning of an English word. For that opinion to be reliable, there must be a proper, accurate and literal interpretation/translation of the word in Spanish to English.

The Government has made no showing to date of the manner, means or person(s) who interpreted or translated the Spanish conversations into English. This is not a fatal flaw at the FRE 702 stage, however, because the foundation for Agent Butler's opinions is premised upon an assumption. For example, her opinion is that "If the word used was "choke," that word would refer to an arrest." At trial, however, if the assumption is not proven, the opinion is not admissible. But, as there is no FRE 702 challenge to testimony of any witnesses who prepared the transcripts from which Agent Butler worked, their accuracy can be addressed at trial.

Secondary to Mr. Chavez's reliability objection is his contention that Agent Butler's testimony as to the nonliteral meaning of specific language intercepted over TT5 does not aid the trier of fact. Relying upon *United States v. Rodriguez*, ___ F.Supp.3d ___, 2015 WL 5138146, *32-33 (D. N.M. 2015), Mr. Chavez argues that once testimony about the general meaning of a term is given, further testimony by the witness as to the meaning in this case is not necessary. Put another way – once the jury has the "dictionary" of terms used in drug trafficking, it can apply these to transcripts of the telephone calls at issue without the assistance of the witness. On an esoteric level, the Court does not disagree, however, for the reasons stated in Section IIA,

11

with regard to testimony about commonly used terms in drug operations, the Court finds this objection without merit.

### III. Conclusion

As set forth herein, proper foundation under FRE 702 has been shown for testimony of Agent Butler that falls within the following two categories: (1) practices and code language commonly used by drug traffickers premised upon on Agent Butler's prior law enforcement experience; and (2) Agent Butler's perception of the meanings of particular words and phrases used in communications involving TT5. The parties are directed to jointly contact chambers to set a pretrial conference and trial within 7 days of this Order.

DATED this 10th day of December, 2015.

**BY THE COURT:**

*Marcia S. Krieger*
_____

Marcia S. Krieger
United States District Court